# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

      v.

PAUL SPENCER RUBLE,

      Defendant.

CASE NO.: 2:15-cr-23

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter comes before the Court after a hearing conducted on February 9, 2016, on the following motions of Defendant Paul Ruble ("Ruble"): Motion to Dismiss Indictment, (doc. 24); Motion to Strike Surplusage, (doc. 25); Motion to Suppress, (doc. 26); Motion for Information Relating to Prior Bad Acts, (doc. 27); Motion for Disclosure Under Rule 807, (doc. 28); Motions for Discovery, (docs. 29, 30); Motion for Intention to Use Evidence, (doc. 31); Motion for Co-Conspirators' Hearsay Exceptions, (doc. 32); Motion to Preserve Evidence, (doc. 33); and Motion for Substance of Promises or Plea Bargains Between Government and Witnesses, (doc. 34), and the Government's Motion for Discovery, (doc. 39). For the reasons which follow, I **RECOMMEND** the Court **DENY** Ruble's Motion to Dismiss Indictment, Motion to Strike Surplusage, and Motion to Suppress. (Docs. 24, 25, 26.) The Court **GRANTS** Ruble's Motion for Disclosure, (doc. 28), Motion for <u>Brady</u> Materials, (doc. 29), Motion for Statements, (doc. 30), Motion for Intention to Use Evidence, (doc. 31), Motion for Co-conspirators' Hearsay Exceptions, (doc. 32), Motion to Preserve Evidence, (doc. 33), and Motion for Substance of Promises or Plea Bargains Between Witnesses and Government, (doc. 34). Ruble's Motion for

Rule 404(b) Evidence, (doc. 27), is **DISMISSED** as moot. The Court **GRANTS** Government's Motion for Discovery, (doc. 39), as unopposed.

## BACKGROUND

The Government asserts that, from July 13, 2011, up to and including April 24, 2013, Ruble, two unindicted co-conspirators, and other known and unknown persons conspired to distribute and dispense quantities of controlled substances, in violation of 21 U.S.C. § 841(a)(1). (Doc. 3, p. 6.) The Government maintains the purpose of the conspiracy was to attract to Apex Health and Wellness ("Apex" or "Apex Health") in Brunswick, Georgia, large numbers of people interested in obtaining prescriptions and to issue prescriptions to such people regardless of whether there was a legitimate medical purpose for the prescriptions, in order to generate large cash proceeds and income for benefit of the conspirators. (Id.) The Government alleges that "M.F." and "S.F.", neither of whom is a medical practitioner, opened Apex for the purpose of unlawfully dispensing and distributing and causing the unlawful dispensing and distributing of controlled substances. (Id.) In addition, the Government states "M.F." and "S.F." hired Defendant Ruble, a medical doctor licensed in the State of Georgia and registered by the Drug Enforcement Agency to write prescriptions for or otherwise dispense controlled substances, to write prescriptions. (Id. at pp. 3–7.) The Government contends the conspirators were able to provide drug-seeking customers controlled substances without legitimate medical purposes by virtue of Ruble's medical license. (Id. at p. 7.)

Ruble has been charged by indictment of one count of conspiracy to knowingly and intentionally distribute and dispense various controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, in violation of 21 U.S.C. § 846; four hundred forty one counts of illegally dispensing controlled substances not for a legitimate

medical purpose and not in the usual course of professional practice, in violation of 21 U.S.C. § 841(a)(1); and one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). Ruble has filed numerous pretrial Motions, which the Court now addresses.

## DISCUSSION

### I.    Motion to Dismiss Indictment (Doc. 24)

Ruble moves the Court, pursuant to Federal Rules of Criminal Procedure 7(c) and 12(b), to dismiss all counts of the indictment against him. According to Ruble, the indictment fails to state an offense relating to the alleged violations of 21 U.S.C. § 841(a), illegal dispensing or distribution of controlled substances. In particular, Ruble contends paragraph 22 of the indictment provides twelve factors by which the grand jury determined controlled substances were "'not prescribed for a legitimate medical purpose and not in the usual course of professional practice.'" (Doc. 24, p. 2 (citing Doc. 3, p. 7).) Ruble asserts the inclusion of these factors in the indictment is the Government's attempt to define substantive standards of medical practice, which are regulated under the States' police powers. Ruble alleges the fatal problem with the indictment is that the grand jury made its probable cause finding on the Section 841(a)(1) charge based on an improper legal standard, as determined by the Government. (Id. at p. 3.) Ruble maintains the Government has usurped the role of the appropriate medical authorities for the State of Georgia to determine what "legitimate medical purpose" and the "usual course of professional practice" are in the State of Georgia. (Id. at p. 8.) Ruble contends the twelve factors listed in paragraph 22 "appear to be nothing more than a list of what the prosecutor determined were indicia of what *he* believes demonstrate the absence of a legitimate purpose or outside the usual course of professional practice." (Id. (emphasis in original).)

The Government avers Ruble's prosecution does not involve any interpretive rules, like the situation present in <u>Gonzales v. Oregon</u>, 546 U.S. 243 (2006), seeking to define a practice as lacking a legitimate medical purpose or a rule which conflicts with a state's assessment of the legitimacy of that practice. (Doc. 37, p. 8.) The Government asserts it has charged that Ruble's conduct and that of his unindicted co-conspirators in prescribing controlled substances was not for a legitimate medical purpose and was not in the usual course of professional practice. The Government also asserts the indictment sets forth the facts it will seek to prove through the presentation of witnesses and documentary evidence at trial, and this issue of whether Ruble broke the law will be determined by a jury.

The Sixth Amendment right of an accused "to be informed of the nature and cause of the accusation," U.S. Const. amend. VI, is implemented by Fed. R. Crim. P. 7(c), which requires that an indictment set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged." Under long-established precedent, an indictment is sufficient under the Constitution and Rule 7(c) if it (1) sets forth the elements of the charged offense in a manner which thoroughly informs the defendant of the charge against which he must defend and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974); <u>United States v. Critzer</u>, 951 F.2d 306, 307 (11th Cir. 1992); <u>United States v. McMath</u>, 2013 WL 5799004 at * 4 (S.D. Ga. Oct. 16, 2013). An indictment is generally sufficient if it simply parrots the wording of the statute itself, provided the statutory language sets forth all the elements of the offense. <u>Hamling</u>, 418 U.S. at 117; <u>United States v. Ramos</u>, 666 F.2d 469, 474 (11th Cir. 1982); <u>see also</u> <u>United States v. Resendiz-Ponce</u>, 549 U.S. 102, 109 (2007). "[W]here the statutory language does not state all of the essential elements of the crime, the indictment must perform that role."

McMath, 2013 WL 5799004, at *4. Ultimately, "'the appropriate test is not whether the indictment might have been drafted with more clarity, but whether it conforms to minimal constitutional standards.'" United States v. McGarity, 669 F.3d 1218, 1235–36 (11th Cir. 2012) (quoting United States v. Varkonyi, 645 F.2d 453, 456 (5th Cir. 1981)). Therefore, where an indictment quotes the statutory language and sets forth the date and place of the charged criminal activity, it need not go further and detail the factual proof that will be relied upon to support the charges. United States v. Coley, No. CR415-187, 2016 WL 743432, at *1 (S.D. Ga. Feb. 23, 2016), *report and recommendation adopted sub nom.*, United States v. Williams, 2016 WL 1032876 (S.D. Ga. Mar. 14, 2016).

In order to prove its case against Ruble, a physician licensed to prescribe controlled substances, the Government must show that "he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." United States v. Bourlier, 518 F. App'x 848, 851 (11th Cir. 2013) (internal citation omitted). The Government will also have to prove "'beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it.'" United States v. Sosa, 777 F.3d 1279, 1290 (11th Cir. 2015) (quoting United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013)).

The language Ruble finds objectionable in paragraph 22 simply lists the actions the Government asserts Ruble and his alleged co-conspirators took in conspiring to violate 21 U.S.C. § 841(a)(1). This language does not "define substantive standards of medical practice", as Ruble asserts. (Doc. 24, p. 2.) Rather, this language provides specific allegations of violations of Section 841. The language of Section 841(a)(1) only provides: "[I]t shall be unlawful for any person knowingly or intentionally--(1) to manufacture, distribute, or dispense, or possess with

intent to manufacture, distribute, or dispense, a controlled substance; or (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance." 21 U.S.C. § 841(a)(1). The Government set forth this language in the indictment against Ruble. The objected-to language in paragraph 22 clarifies the means and manner in which the Government contends Ruble and his co-conspirators violated Section 841(a)(1). Thus, Ruble has received notice of the offenses the Government contends he committed and the means and manner in which he committed the offenses, which allows Ruble to defend himself against these charges.

Ruble's reliance on Gonzales v. Oregon, 546 U.S. 243 (2006), is misplaced. In Gonzales, the United States Supreme Court assessed whether the United States Attorney General's Interpretative Rule restricting the use of controlled substances for physician-assisted suicide in Oregon was a valid exercise of federal authority under the Controlled Substances Act, 21 U.S.C. § 802, et seq. ("CSA").[1] 546 U.S. at 254. The Supreme Court noted that the CSA authorizes the Attorney General to "promulgate rules relating only to 'registration' and 'control,' and 'for the efficient execution of his functions' under the statute." Id. at 259. However, the CSA did not "delegate to the Attorney General authority to carry out or effect all provisions of the CSA." Id. The Supreme Court concluded that the Attorney General's Interpretative Rule was "an interpretation of the substantive federal law requirements . . . for a valid prescription. It begins by announcing that assisting suicide is not a 'legitimate medical purpose' . . . and that dispensing controlled substances to assist a suicide violates the CSA. . . . The Interpretative Rule thus purports to declare that using controlled substances for physician-assisted suicide is a crime, an authority that goes well beyond the Attorney General's statutory power to register or deregister."

---

[1] The Oregon law at issue is the Oregon Death With Dignity Act, Ore. Rev. Stat. § 127.800, *et seq.*, ("ODWDA"). The ODWDA "exempts from civil or criminal liability state-licensed physicians who, in compliance with the specific safeguards in ODWDA, dispense or prescribe a lethal dose of drugs upon the request of a terminally ill patient." Gonzales, 546 U.S. at 249.

Id. at 261.  The Supreme Court explained that "there is no question that the Federal Government can set uniform national standards" of medical practice, but the Court concluded that the Act "manifests no intent to regulate the practice of medicine generally[.]"  Id. at 270–71.  "The Court stated that, because '[t]he structure and operation of the [Act] presume and rely upon a functioning medical profession regulated under the States' police powers,' the Act does not empower the Attorney General to declare that physician-assisted suicide is not a legitimate medical purpose."  United States v. Joseph, 709 F.3d 1082, 1094–95 (11th Cir. 2013) (quoting Gonzales, 546 U.S. at 270) (alterations in original).

In United States v. Volkman, 797 F.3d 377, 386 (6th Cir. 2015), the Sixth Circuit Court of Appeals joined its sister Circuits and found "Gonzales did not impose new requirements to prove a violation of the CSA.  Instead, the statement that Volkman now quotes was merely part of the Court's commentary about statutory intent, federalism, and rulemaking authority—none of which is at issue here."  The Sixth Circuit specifically noted the decisions in United States v. Lovern, 590 F.3d 1095 (10th Cir. 2009), in which the Tenth Circuit Court of Appeals "commented on Gonzales' relevance—or lack thereof—in the setting of a criminal prosecution[,]" and in United States v. Kanner, 603 F.3d 530, 535 (8th Cir. 2010), in which the Eighth Circuit Court of Appeals "added to the Lovern court's conclusions by noting that 'Gonzales did not supplant the standard for violations of the CSA.'"  Volkman, 797 F.3d at 385–86.

Ruble fails to present an Interpretative Rule defining a practice as lacking a legitimate medical purpose or conflicting with Georgia's assessment of the legitimacy of that practice, as was present in Gonzales.  Instead, and as stated above, the indictment in this case merely sets forth the acts of Ruble and his co-conspirators in prescribing controlled substances, which the

Government alleges was not done for a legitimate medical purpose and was not done in the usual course of professional practice. This Court has permitted the Government to prosecute cases on previous occasions in which the indictments in those cases set forth the same or similar actions of physicians. See, e.g., Superseding Indictment, United States v. Azmat, Case Number 4:13-cr-28, (S.D. Ga. Aug. 7, 2013), ECF No. 156, pp. 9–10.[2] The inclusion of paragraph 22 in the Indictment in this case does not render that Indictment defective. Thus, the Court should **DENY** Ruble's Motion to Dismiss.

## II.     Motion to Strike Surplusage (Doc. 25)

In his related Motion to Strike Surplusage, Ruble moves to strike the language in paragraph 22 of the Indictment, as well as references to "pill mills" and "sponsors" in paragraphs 12, 13, 23, and 27, and the portion of paragraph 28 beginning with "During the course and in furtherance" through and including "[a]s a consequence." (Doc. 25, p. 2.) Ruble contends this language is irrelevant and prejudicial and should be stricken from the Indictment as surplusage. Specifically as to the language in paragraph 22, Ruble maintains this language would confuse the issues and blur the elements under separate counts because this paragraph contains an incorrect legal standard. (Id. at p. 3 (internal citation omitted).) Ruble asserts the terms "pill mill" and "sponsor" are not defined in 21 U.S.C. § 802, whereas "dispense", "distribute", and "addict" are, and the placement of these statutorily undefined terms with defined terms creates "the impression" these terms "are on the same statutory footing[.]" (Id. at p. 5.) As to the language in paragraph 28 that Ruble wishes to be stricken, he states that the fact that several local pharmacies refused to honor his prescriptions could be a fact created by law enforcement

---

[2]    The Eleventh Circuit affirmed Azmat's convictions and sentence for conspiracy and unlawful dispensation of controlled substances based on the "overwhelming evidence" of Azmat's unlawful actions. United States v. Azmat, 805 F.3d 1018, 1035–36 (11th Cir. 2015). Azmat's petition for writ of certiorari is currently before the United States Supreme Court. No. 15-8145, Doc. 1.

because these pharmacies could have been alerted to an investigation of Ruble's medical practice. Ruble maintains these pharmacies could have decided to stop honoring his prescriptions in an effort to protect their own licenses and businesses upon learning Ruble was a target of an investigation. Thus, Ruble asserts the Government must show these pharmacies refused to honor his prescriptions "due to the large quantities and medically inappropriate dosages of controlled substances [Ruble] was prescribing[,]" as alleged in the indictment. (Id. at pp. 6–7.)

The Government contends the Indictment contains no irrelevant or unduly prejudicial language, and Ruble's Motion to Strike should be denied. The Government notes Ruble has not met the exacting burden necessary to strike any of the language from the Indictment, and he cites to no authority in which language similar to the language in the Indictment here was deemed to be surplusage. In addition, the Government asserts Ruble fails to assert that the challenged language is inconsistent with commonly understood meanings or that it inaccurately describes Ruble's activities. (Id. at p. 9.) The Government asserts, in the alternative, the Court should defer ruling on this Motion until the Court has heard evidence that will establish the relevance of the alleged surplus language. (Id. at p. 12.)

"Upon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). A motion to strike surplusage should be denied "'unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'" United States v. Awan, 966 F.2d 1415, 1426 (11th Cir. 1992) (quoting United States v. Huppert, 917 F.2d 507, 511 (11th Cir. 1990)). "This is a most exacting standard." Id. (internal punctuation and citation omitted). In other words, a motion to strike surplusage "will be granted only where the challenged allegations are not relevant to the crime charges and are inflammatory

and prejudicial." United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (emphases added) (internal citation omitted).

### A. Language in Paragraph 22

As to the language in paragraph 22 of the Indictment, the Court notes that Section 846 does not require proof of the overt acts of the conspiracy, and the Government is not required to allege specific conduct in the Indictment. However, even though the Government is not required to include this challenged language in the Indictment, "arguably indicating it is surplusage," Ruble fails to carry his "burden of establishing that the averments are not relevant to the facts the Government may prove at trial or, if that burden is met, establishing that the averments are inflammatory and prejudicial." United States v. Webman, Crim. Action No. 1:13-CR-0025-SCJ, 2014 WL 835988, at *5 (N.D. Ga. Mar. 4, 2014) (quoting United States v. Kelley, Crim. No. 08-00327-CG, 2009 WL 2176347, at *2 (S.D. Ala. July 17, 2009) ("[A] defendant must first show that the allegations are not relevant to the charges and [t]hen, if that burden is met, . . . must show that the challenged language is unfairly prejudicial and inflammatory.") (second alteration in original)). Ruble contends this language contains an incorrect legal standard. As discussed above, this language does not constitute a legal standard, let alone an incorrect one. In addition, although Ruble contends this language is "highly prejudicial", (doc. 25, p. 3), he does not make this contention with any specificity, nor does he state how this language is irrelevant to the charged offenses. Ruble does not meet the "exacting standard" warranting the striking of paragraph 22 from the Indictment in this case. Thus, the Court should **DENY** this portion of Ruble's Motion.

**B.     Use of "pill mill" and "sponsor"**

As with the language contained in paragraph 22, the Government's use of "pill mill" and sponsor" in the Indictment are allegations the Government will have to prove at trial in order to obtain a conviction against Ruble for his alleged involvement in a conspiracy to violate the CSA. These terms are "commonly used" to describe "certain types of pain management clinics", and other courts have found there is nothing "inappropriate or unduly prejudicial" about using these words.  United States v. Guzman, 571 F. App'x 356, 360–61 (6th Cir. 2014) (the term "pill mill" "is a term commonly used by courts . . . to describe illicit pain management clinics and citing with approval the district court's reasoning that this term is not a legal conclusion but a phrase used in law enforcement and media to describe certain activity and is a shorthand way of characterizing the nature of the alleged illegal operation"); United States v. Kincaid, No. 3:10-CR-160, 2013 WL 5595404, at *3 (E.D. Tenn. Oct. 11, 2013) (same); United States v. Caroni, No. 3:10CR101/MCR, 2011 WL 4102343, at *4 (N.D. Fla. Sept. 13, 2011) ("[T]he phrase 'pill mill' is not a legal term and, instead, is commonly used by laypeople to describe certain types of pain management clinics[,]" and there is "nothing inappropriate or unduly prejudicial" about this phrase.); see also Azmat, 805 F.3d at 1028, 1036 (recounting the trial evidence against Azmat, including a witness' testimony about "sponsors" being "pill seekers who would pay for patients' appointments in exchange for a portion of the pill prescribed during the visit[ ]", and concluding the totality of the evidence was "more than sufficient for the jury to determine" that the clinic was a "pill mill").

Ruble has failed to show that the Government's use of "pill mill" and "sponsor" in the Indictment is unduly prejudicial, and Ruble certainly fails to show that the use of these terms is

irrelevant to the charged conduct. Consequently, the Court should **DENY** this portion of Ruble's Motion.

### C. Language in paragraph 28

Likewise, Ruble fails to meet the "exacting standard" entitling him to the striking of language contained in paragraph 28 of the Indictment. Ruble claims that the pharmacies' refusals to honor his prescriptions may be a "fact" created by law enforcement, which would not support the inference that these pharmacies refused to honor his prescriptions "due to the large quantities and medically inappropriate dosages of controlled substances" he prescribed, as alleged in the Indictment. (Doc. 25, pp. 6–7.) Again, this allegation is relevant to the charged offenses, even if such an allegation is prejudicial. As Ruble recognizes, the propriety of this language rests on what the Government is able to prove as to this allegation at trial. Thus, the Court should **DENY** this portion of Ruble's Motion.[3]

## III. Motion to Suppress (Doc. 26)

As part of the investigation leading to the Indictment in this case, officers searched Ruble's home located on St. Simons Island, Georgia. Officers searched the home after obtaining a warrant authorizing the search from United States Magistrate Judge James Graham. Judge Graham issued the warrant pursuant to an application and supporting affidavit submitted by Special Agent Michael Marbet.

Ruble contends all evidence seized as a result of the search of his home should be suppressed as fruits of an illegal search. (Doc. 26, p. 1.) Ruble maintains the search warrant and supporting affidavit failed to establish probable cause to believe evidence of the crimes for which

---

[3] Based on the record before the Court at this time, including argument made during the hearing on these pre-trial motions, I recommend that the Court rule upon Ruble's discrete argument relating to the pharmacies' refusal to honor his prescriptions at this time. However, in the alternative, the Court can defer ruling on this discrete argument at trial to determine the relevance of this alleged surplus language once the Government presents its case-in-chief. Awan, 966 F.2d at 1209.

he has been indicted would be found at his residence. Additionally, Ruble contends the warrant did not identify the items to be seized with sufficient particularity, which amounts to the equivalent of authorizing a general exploratory search. (Id.)

The Government asserts the affidavit and attachments supporting the application for search warrant described the alleged unlawful drug and financial activities of Ruble and his co-conspirators in detail. The Government also asserts the affidavit in support of the search warrant provided a thorough history of Apex Health, the identity and roles of the alleged participants of the criminal conspiracy, and the financial investigation of Apex Health. (Doc. 38, p. 2.) The Government avers the affidavit set forth that, in the experience of the affiant and a computer investigative specialist with the Federal Bureau of Investigation ("FBI"), records of the alleged offenses occurring at Apex Health would be found at the clinic and at the homes of the conspirators, including Ruble. The Government contends the affidavit established a connection between Ruble and his residence to be searched and a link between Ruble's residence and evidence of criminal activity. (Id. at p. 4.) The Government maintains that, if the Court were to find probable cause lacking in the search warrant, the Leon good faith exception negates application of the exclusionary rule.

### A.  Probable Cause

"The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 95 (2006) (quoting Illinois v. Gates,

462 U.S. 213, 238 (1983)). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts" and is based on the "totality of the circumstances test." Id. (internal citations and punctuation omitted). These probabilities need not be technical, but "are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994). In addition, "these probabilities need not come from direct observation but may be inferred from the particular circumstances at issue." United States v. Donaldson, No. CR 111-361, 2012 WL 1142922, at *10 (S.D. Ga. Feb. 23, 2012), *report and recommendation adopted*, 2012 WL 1142934 (S.D. Ga. Apr. 4, 2012), *aff'd*, 558 F. App'x 962 (11th Cir. 2014) (citing United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990)). "[I]t is well established that, in combination with other factors, warrant-issuing magistrates may consider an officer's experience, knowledge, and expertise in making probable cause determinations." Id. at *12 (quoting United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation [for issuing a search warrant].")); Jenkins, 901 F.2d at 1081 (confirming appropriateness of officer applying for warrant relying on conversation with 17-year veteran FBI agent who had worked for 10 years on bank robbery and burglary matters to support finding of probable cause in warrant affidavit that fruits of theft likely to be found in residence to be searched); see also United States v. Villegas-Tello, 319 F. App'x 871, 875 (11th Cir. 2009) (holding that, in conducting a probable cause analysis, courts may consider officers' experience, "as 'conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer'").

"Probable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (internal citation omitted). "When law enforcement seeks a warrant to search a residence, the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home." United States v. Lebowitz, 676 F.3d 1000, 1011 (11th Cir. 2012) (internal citation and punctuation omitted). "The affidavit need not allege illegal activity occurred at the home, but the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. (internal citations and punctuation omitted). In United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009), the Eleventh Circuit stated:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime.

(quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981)).[4]

In his application for search warrant, Special Agent Marbet stated the basis for the search warrant was to search for evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime. Gov't Hr'g Exh. 1, p. 1. Agent Marbet also stated the requested search was related to violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 1956 and 1957. (Id.) Agent Marbet listed several categories of records and items relating to violations of these statutes, which included: wire transfer records; identification documents for Ruble and his alleged co-conspirators and other

---

[4] In Green, the former Fifth Circuit Court of Appeals, Unit B, concluded that, since the criminal activity alleged occurred in California, there could be "no justification for a reasonable person to conclude that there was probable cause to believe that fruits or instrumentalities of crimes could be found at [Defendant's] Florida residence." 634 F.3d at 226.

fictitious names; copies of cashier's checks, money order receipts, or other monetary instruments; bank records; receipts for packages sent or received; travel records; records reflecting the purchase or sale of pills or prescriptions; records reflecting assets or personal expenditures; currency; safe deposit boxes or keys; business ownership records; and various electronic information or data. (Id. at pp. 3–4.) Additionally, Agent Marbet described Ruble's residence, including his address and directions to reach Ruble's residence. (Id. at p. 2.)

Agent Marbet set forth in his affidavit supporting his application for search warrant that he has been in law enforcement for approximately 28 years, and he has been with the Drug Enforcement Agency ("DEA") for eighteen of those years. (Id. at p. 10.) Agent Marbet declared he has had extensive law enforcement training, including over 500 hours of specialized training in physical and electronic surveillance, undercover operations, and conspiracy, asset removal, and financial investigations. (Id. at pp. 10–11.) Agent Marbet stated that, based on his training and experience as to prescription drugs, medical practitioners, and owners of pain clinics, he knows: "It is common for individuals who illegally prescribed controlled substances to secrete contraband and records of drug transactions in secure locations within their residence and/or business or on computers for their ready access and to conceal them from law enforcement authorities." (Id. at pp. 12–13.) Agent Marbet also declared that he is aware that people involved in the unlawful dispensation and diversion of pharmaceuticals go to great effort to avoid detection by law enforcement, which typically involves "storing evidence of the unlawful dispensation and diversion, including evidence related to receipt and payment of proceeds from the operation of the pain clinic, at the person's primary residence." (Id. at p. 13.)

Further, Agent Marbet recounted the facts and circumstances of the DEA's investigation of Ruble and Apex Health, including interviews with persons who had visited Apex Health to

obtain controlled substances and evidence uncovered during visits to Apex Health by undercover law enforcement agents posing as patients at Apex Health. (Id. at pp. 17–53.) Additionally, Agent Marbet disclosed the findings of surveillance activities and the financial aspects of the investigation, which included discovery of bank accounts opened in the name of Apex Health, its principles, and Ruble. (Id. at pp. 53–61.) Further, Agent Marbet disclosed he consulted with a computer investigative specialist with the FBI, who advised Marbet as to what type of electronically stored forensic information that could be obtained from a person's computer. (Id. at pp. 62–68.) Agent Marbet concluded he believed probable cause supported his affidavit in support of his application for a search warrant for the search of Ruble's Saint Simons Island residence. (Id. at pp. 68–69.)

Based on the information contained in Agent Marbet's affidavit, there was a fair probability that evidence of the alleged conspiracy and money laundering scheme occurring at Apex Health would be found in Ruble's residence. Common sense dictates that it would be reasonable that personal financial records and proof of personal expenditures from the proceeds of the alleged activity at Apex Health would be found at Ruble's residence. In addition, Agent Marbet's many years' experience in law enforcement, eighteen of which have been with the DEA, along with the knowledge obtained as a result of his experience and training, taken in combination with common sense and the facts discovered during the course of the DEA's investigation, reveals there was sufficient probable cause justifying the issuance of the search warrant. Moreover, Apex Health is approximately fifteen miles from Ruble's Saint Simons Island residence. This proximity supports a nexus between the place of the alleged illegal activity and Ruble's residence, which is a place where he could have easily secreted evidence relating to and fruits of this illegal activity. Contra Green, 634 F.2d at 225–26 (finding no

evidence in the affidavit that a reasonable person could conclude fruits or instrumentalities of criminal activity occurring thousands of miles away from the defendant's residence could be found in that residence). Accordingly, Agent Marbet presented probable cause for the issuance of the search warrant, and, therefore, the Court should **DENY** Ruble's Motion to Suppress.

### B. Good Faith Exception

Even if probable cause supporting the search warrant were lacking, any evidence discovered as result of the execution of the warrant to search Ruble's residence would be admissible under the "good faith" exception to the exclusionary rule. United States v. Leon, 468 U.S. 897 (1984). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and the judicially created remedy known as the exclusionary rule acts as a deterrent to violating the Fourth Amendment by preventing the use of evidence seized as a result of an illegal search. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). Exclusion "is a remedy of last resort," United States v. Smith, 741 F.3d 1211, 1219 (11th Cir. 2013), but evidence seized pursuant to a search warrant that is invalid under the Fourth Amendment must be suppressed, or excluded, from the trial of a case. See generally Leon, 468 at 906–09 (discussing the origin and scope of the exclusionary rule).

"The good-faith exception applies in all but four sets of circumstances." United States v. Lara, 588 F. App'x 935, 938 (11th Cir. 2014) (citing Leon, 468 U.S. at 923). The good-faith exception does not apply when: "(1) the magistrate judge was misled by information the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the magistrate judge wholly abandoned his judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." United States v. Hill, No. CR 114-028, 2014 WL 5410214, at *7 (S.D. Ga. Oct. 23, 2014) (citing United States v. Robinson, 336 F.3d 1293, 1296 (11th Cir. 2003)).

The good-faith exception to the exclusionary rule does apply when the search warrant is invalid but was issued by "a detached and neutral magistrate," and the officers executing the warrant "reasonably rel[ied]" on it. Id. at 913. The good-faith exception to the exclusionary rule is appropriate because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. Thus, under Leon, the question becomes whether the officers executing the warrant reasonably relied on Magistrate Judge Graham's determination of probable cause. See United States v. Herring, 492 F.3d 1212, 1215 (11th Cir. 2007) ("[T]he exclusionary rule does not bar the use of evidence obtained by officers acting in good faith reliance on a warrant."). "The exception exists because the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." United States v. Whitehurst, 614 F. App'x 411, 414 (11th Cir. 2015).

Here, considering the totality of the circumstances, the Court finds that the Leon good-faith exception does apply. Ruble does not allege any material misrepresentations or omissions by law enforcement in obtaining the warrant. In addition, the issuing judge did not abandon his judicial role. The warrant applications provided a wealth of information that established probable cause. Further, the warrant is not so facially deficient in any respect, especially with regard to the issues of probable cause and particularity, that the executing officers could not

reasonably presume it to be valid.  Thus, the Court should **DENY** Ruble's Motion to Suppress for these reasons as well.

## IV.     Motion for Information Regarding Prior Bad Acts (Doc. 27)

Through this Motion, Defendant requests that this Court order the Government to show whether it intends to introduce, pursuant to Federal Rule of Evidence 404(b), any evidence of other crimes, wrongs, or acts.  In response, the Government asserts that a separate Rule 404(b) notice has not been filed, as all evidence contained in the discovery materials is considered intrinsic to the offenses charged.  (Doc. 40, p. 3.)

Rule 404(b) provides in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b). The Eleventh Circuit uses a "three-prong test to determine the admissibility of evidence under Rule 404(b): (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act; and (3) the evidence's probative value cannot be substantially outweighed by its undue prejudice."  United States v. Robinson, 341 F. App'x 546, 548 (11th Cir. 2009).

As the Government stated it has no Rule 404(b) evidence outside of the intrinsic acts, this Motion is **DISMISSED** as moot.

## V.     Rule 807 Residual Exception Disclosure (Doc. 28)

Defendant asserts he will object to any proffer of hearsay testimony and will move to suppress any such testimony.  Defendant alleges that, if the Government seeks to offer hearsay testimony under Federal Rule of Evidence 807, it is required to disclose the substance of any

statements it intends to offer. Defendant requests that such disclosure occur not less than thirty days prior to trial. (Doc. 28, p. 1.) The Government states it will comply with Rule 807's notice requirement if it intends to offer hearsay evidence.

Federal Rule of Evidence 807—the residual exception to the hearsay rules—reads in relevant part:

> (a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> > (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> >
> > (2) it is offered as evidence of a material fact;
> >
> > (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> >
> > (4) admitting it will best serve the purposes of these rules and the interests of justice.

Rivers v. United States, 777 F.3d 1306, 1311–12 (11th Cir. 2015) (quoting Fed. R. Evid. 807(a)). "The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). "Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances[.]" United Techs. Corp. v. Mazer, 556 F.3d 1260, 1279 (11th Cir. 2009).

This Motion is **GRANTED** as unopposed. Should the Government decide to use evidence under Rule 807, it must provide Ruble sufficient notice of its intent to use this evidence not less than thirty days prior to the trial of this case.

**VI.     Motion for Discovery of <u>Brady</u> Materials and Rule 16 Discovery (Doc. 29)**

Ruble requests that the Government disclose and provide all exculpatory information and materials, including impeachment materials.  Ruble also requests that the Government provide all known evidence, or evidence with the exercise of due diligence should be known, which arguably is favorable to him on the issues of guilt or innocence or punishment.  In this regard, Ruble seeks his oral and written or recorded statements, his prior records, and written summary of any testimony the Government intends to use under Rules 702, 704, and 705.  Ruble contends information impeaching a witness' credibility, such as prior felony convictions, specific instances of misconduct or crimes, any benefits given or promised to a witness, must be disclosed prior to trial.  (Doc. 29, pp. 3–8.)

The Government responds it has complied with Federal Rule of Criminal Procedure 16[5] and has made available to defense counsel investigative reports, Ruble's criminal history and statements, consensual recordings, the grand jury transcript, and other documentary evidence. The Government states it will file a <u>Brady-Giglio</u>[6] notice prior to trial, and such notice will include the criminal histories of witnesses the Government expects to call and any considerations extended to those witnesses.  (Doc. 40, p. 1.)

This Motion is **GRANTED** as unopposed.  During the hearing on these Motions, the Government asked that they be allowed to produce any information fourteen days prior to trial.

---

[5]  Rule 16 sets for the information the Government is to disclose to a requesting defendant, including that defendant's written and oral statements, the defendant's prior record, and certain documents and evidence.  Fed. R. Crim. P. 16(a)(1).

[6]  In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Supreme Court held that the suppression of evidence by the prosecution favorable to the accused upon request violates due process where the evidence is material to guilt or punishment, regardless of the good or bad faith of the prosecution.  In <u>Giglio v. United States</u>, 405 U.S. 150, 154–55 (1972), the Supreme Court determined that, when a witness' credibility is material to the prosecution of a case, and evidence of any understanding or agreement as to a future prosecution would be relevant to a credibility determination, the jury is to be made aware of this agreement.

That request is granted, and the Government shall produce all responsive information no later than fourteen days prior to trial. However, as the Court advised the Government during this hearing, fourteen days is the floor for disclosure, meaning the Government is encouraged to disclose this information more than fourteen days prior to the trial of this case.

## VII.    Motion for Copy of Defendant's Statements (Doc. 30)

Ruble requests that he be provided with a copy of any statements, whether written or oral, he has made. (Doc. 30, p. 1.) The Government responds that it has made his statements available to Ruble.

Ruble's Motion is **GRANTED** as unopposed.

## VIII.   Motion for Notice by the Government of the Intention to Use Evidence (Doc. 31)

Ruble moves the Court pursuant to Federal Rule of Criminal Procedure 12 for an order requiring the Government to provide notice of its intent to use evidence he may be entitled to discover under Rule 16.

The Government asserts any and all matters contained in its discovery materials are subject to presentation during its case-in-chief or during rebuttal. The Government specifically notes these materials may contain statements by co-conspirators made during and in the course of furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2).

Ruble's Motion is essentially another Rule 16 Motion. As such, his Motion is **GRANTED** as unopposed under the terms set forth above.

## IX. Co-conspirators' Hearsay Exceptions (Doc. 32)

Ruble requests that the Government provide the substance of any and all statements it alleges are admissible as statements of co-conspirators made during the course and in furtherance of the conspiracy. Ruble contends these statements "are said to be impliedly authorized by the defendant as principal and are therefore admissions by the defendant." (Doc. 32, p. 1.)

As noted above, the Government asserts the extensive discovery materials it has provided to Ruble may contain statements made by co-conspirators. Additionally, the Government stated during the hearing that it had disclosed to Ruble videos of an undercover agent speaking with Ruble and his co-conspirators.

As the Government has relayed that it has provided all materials responsive to Ruble's Motion, the Motion is **GRANTED** as unopposed.

## X. Motion to Preserve Evidence (Doc. 33)

In this Motion, Ruble asks that the Court direct the Government to preserve and remain intact and not destroy or alter any investigative reports (including rough drafts), witness statements, documents, papers, rough notes, tapes, objects, contraband, or other physical evidence in its possession, custody, or control. Ruble contends this motion does not demand disclosure, discovery, inspection, or production.

The Government does not oppose this Motion; however, the Government states it does not consent to making these materials discoverable absent a showing of relevance and need.

Based on the parties' representations during the hearing, Ruble's Motion is **GRANTED** as unopposed.

**XI.     Motion for Substance of Promises or Plea Bargains Between Witnesses and Government (Doc. 34)**

Ruble moves the Court for "the substance of any and all statements or discussions had with any of the witnesses or unindicted co-defendants herein or with any such person's counsel indicating a promise or a suggestion  of leniency, compensation, assurance not to prosecute, agreement to proceed on only  certain counts of an indictment, representations with respect to yet uncharged misconduct,  or any benefit accruing to said individuals whatsoever in exchange for their cooperation,  assistance or testimony at the trial herein, as well as any probations, paroles, pending  charges or other offenses known to the government which have not been charged, as same  relate to a government witness' motive for testifying on their behalf."  (Doc. 34, p. 1.)

The Government responds that these disclosures will be made part and parcel with its Brady-Giglio disclosures, and these disclosures will be made fourteen days prior to trial.  The Government also states it will provide the criminal histories of any witnesses.

"[T]he government has a duty to disclose evidence of any understanding or agreement as to prosecution of a key government witness."  Brown v. Wainwright, 785 F.2d 1457, 1464 (11th Cir. 1986).  "The reason for such disclosure is to ensure that the jury knows the facts that might motivate a witness in giving testimony."  United States v. Winston, 372 F. App'x 17, 19 (11th Cir. 2010) (internal citation omitted).

This Motion is **GRANTED** as unopposed.   In addition, as with its Brady-Giglio disclosures, the Government shall disclose any known information to defense counsel at a minimum of fourteen days prior to trial.

To be clear, the Government is required to disclose any information regarding favorable treatment or consideration given to its witnesses known to the Government through reasonable means.  At the hearing, defense counsel raised the prospect of a government witness who had

received favorable treatment from law enforcement short of a negotiated plea agreement. Counsel provided the hypothetical example of a witness who had not been arrested despite the fact that law enforcement knows that the witness engaged in unlawful conduct. Defense counsel pointed out that the witness' criminal history report would not disclose this type of favorable treatment. The Government may obtain this information through reasonable means by speaking with law enforcement agents and others acting on behalf of the Government in this case. If those acting on behalf of the Government in this case are aware that any witness has not been arrested despite law enforcement's knowledge of the witness' criminal activity, then Brady compels disclosure of that information. See Bridges v. Beard, 941 F. Supp. 2d 584, 605 (E.D. Pa. 2013), ("However, while evidence of uncharged crimes may not have been admissible to impeach [witness'] character, his numerous run-ins with the law—none of which resulted in his arrest—could have been used to demonstrate his potential bias in favor of law enforcement.").

However, the Court stresses that the prosecution in this case is not charged with knowledge of all other law enforcement agencies. United States v. Naranjo, 634 F.3d 1198, 1212 (11th Cir. 2011) ("Knowledge of information that state investigators obtain is not imputed for Brady purposes to federal investigators who conduct a separate investigation when the separate investigative teams do not collaborate extensively."); Moon v. Head, 285 F.3d 1301, 1309–10 (11th Cir. 2002) (noting that (1) a prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf, including law enforcement officers, and (2) thus knowledge possessed by any member of the "prosecution team" is imputed to the prosecutor, but (3) whether knowledge held by members of one governmental entity can be imputed to a prosecutor working for a different governmental entity is determined using "a case-by-case analysis of the extent of interaction and cooperation between the two governments"

(quoting United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979)); United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989) ("A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness."). Nonetheless, the prosecution "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995); see also Meros, 866 F.2d at 1309. Thus, to the extent that those acting on the Government's behalf in this case, be they federal or state agents, are aware of information responsive to the Defendant's request, that information must be disclosed.

**XII.    Government's Motion for Discovery (Doc. 39)**

The Government moves pursuant to Rule 16 for the disclosure of documents and tangible objects, reports of examinations and tests, and expert witness testimony by Ruble. The Government's Motion is **GRANTED** as unopposed.

## CONCLUSION

For the reasons stated above, I **RECOMMEND** the Court **DENY** Ruble's Motion to Dismiss, Motion to Strike Surplusage, and Motion to Suppress. (Docs. 24, 25, 26.) The Court **GRANTS** Ruble's Motion for Disclosure, (doc. 28), Motion for Brady Materials, (doc. 29), Motion for Statements, (doc. 30), Motion for Intention to Use Evidence, (doc. 31), Motion for Co-conspirators' Hearsay Exceptions, (doc. 32), Motion to Preserve Evidence, (doc. 33), and Motion for Substance of Promises or Plea Bargains Between Witnesses and Government, (doc. 34). The Court **DISMISSES** as moot Ruble's Motion for Rule 404(b) Evidence, (doc. 27). The Court **GRANTS** as unopposed the Government's Motion for Discovery, (doc. 39).

The Court **ORDERS** any party seeking to object to these rulings must file specific objections within **fourteen (14) days** of the date of this Report and Recommendation. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Motions must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's ruling directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Clerk of Court is **DIRECTED** to serve a copy of this Report and Recommendation upon Ruble and the Government.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 12th day of April, 2016.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA